## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**J. DOE**                                    **CIVIL ACTION**

**VERSUS**                                    **NO. 21-205**

**OCHSNER HEALTH SYSTEM et al.**              **SECTION: "G"(5)**

## <u>ORDER AND REASONS</u>

Plaintiff J. Doe ("Plaintiff") was expelled from a medical school program jointly administered by Ochsner Clinic Foundation ("Ochsner") and University of Queensland ("UQ") (collectively, "Defendants") after Plaintiff admitted to falsifying attendance documents, forging the signatures of two of the physicians overseeing Plaintiff's clinical rotations, and forging a clinical assessment of Plaintiff's performance during the rotation.[1] Plaintiff asks this Court to vacate Defendants' decision to expel Plaintiff, because Plaintiff alleges that Defendants breached their contractual obligations to Plaintiff.[2] Before the Court is Defendants' Motion for Summary Judgment.[3] Defendants seek summary judgment on Plaintiff's claims because they argue that the decision to expel Plaintiff was not arbitrary or capricious.[4] Plaintiff opposes the motion and argues that there are genuine issues of material fact in dispute precluding summary judgment.[5] Considering the motion, the memoranda in support and in opposition, the record, and the applicable

---

[1] *See* Rec. Doc. 36-1; Rec. Doc. 41-1.

[2] Rec. Doc. 7.

[3] Rec. Doc. 36.

[4] Rec. Doc. 36-2 at 2.

[5] Rec. Doc. 41.

law, the Court grants the motion.

## I. Background

### A.    *Factual Background*

Most of the facts at issue in this case are undisputed.[6] Defendants jointly administer a medical school program with the first two years of classroom instruction occurring at UQ's campus in Brisbane, Australia, and the last two years of clinical instruction occurring at Ochsner Clinical School in and around Southeast Louisiana.[7] On August 25, 2015, Plaintiff received an offer to enter the UQ/Ochsner Doctor of Medicine program.[8] Plaintiff accepted the offer on September 2, 2015.[9] In January 2016, Plaintiff began the UQ/Ochsner medical program with coursework at UQ's campus in Brisbane, Australia.[10] After Plaintiff completed two years of classroom work in Australia, Plaintiff moved to the New Orleans area in December 2017 to begin clinical rotations through Ochsner.[11]

Beginning in 2012, Plaintiff sought treatment for mental health issues with Dr. Thomas Richardson, and Plaintiff was diagnosed with major depressive disorder.[12] In 2018, Plaintiff began seeing Dr. Jennifer Archie, and Plaintiff was diagnosed with a moderate episode of recurrent major depressive disorder.[13] In the Fall of 2018, Plaintiff took a leave of absence from the medical

---

[6] *See* Rec. Doc. 36-1; Rec. Doc. 41-1. Plaintiff argues that some of the facts presented by Defendants' Statement of Uncontested Facts are not material. *Id.* Nevertheless, Plaintiff does not dispute the facts set forth in this background.

[7] Rec. Doc. 36-1 at 1; Rec. Doc. 41-1 at 2.

[8] Rec. Doc. 36-1 at 1; Rec. Doc. 41-1 at 2–3.

[9] Rec. Doc. 36-1 at 2; Rec. Doc. 41-1 at 3.

[10] Rec. Doc. 36-1 at 2; Rec. Doc. 41-1 at 3.

[11] Rec. Doc. 36-1 at 2; Rec. Doc. 41-1 at 3.

[12] Rec. Doc. 36-1 at 3; Rec. Doc. 41-1 at 3.

[13] Rec. Doc. 36-1 at 3; Rec. Doc. 41-1 at 6–7.

program to address these mental health issues, but Plaintiff ultimately completed those rotations in January 2019.[14]

As part of Plaintiff's clinical rotations, Plaintiff was enrolled in the course MED7319 General Practice, and Plaintiff was assigned to an Ochsner clinic in Slidell, Louisiana.[15] Plaintiff was required to attend a certain number of sessions each week at the clinic under the supervision of Dr. Raymond Baez and Dr. Kenneth Long.[16] To receive credit for the course, Plaintiff was required to attend 28 of 30 scheduled sessions at the Slidell clinic.[17] Despite only attending six of the required sessions, Plaintiff submitted an attendance sheet purporting to be signed by Drs. Baez and Long and purporting to confirm that Plaintiff attended the required 28 sessions.[18]

Ochsner's Clerkship Director, Melissa Johnson, later learned from Dr. Long that Plaintiff had not attended any of the required clinical rotations under Dr. Long's supervision.[19] Ms. Johnson then confirmed with Dr. Baez that Plaintiff had only attended the required clinical rotation sessions from July 1, 2019 through July 11, 2019.[20]

On September 5, 2019, Plaintiff attended meeting with Dr. Mehul Sheth and Ms. Johnson.[21] During that meeting Plaintiff admitted to forging the signatures of Drs. Long and Baez on the attendance sheet for the periods of June 24, 2019 to June 27, 2019 and July 15, 2019 to August 1,

---

[14] Rec. Doc. 36-1 at 4; Rec. Doc. 41-1 at 6–7.

[15] Rec. Doc. 36-1 at 5; Rec. Doc. 41-1 at 9.

[16] Rec. Doc. 36-1 at 5; Rec. Doc. 41-1 at 9.

[17] Rec. Doc. 36-1 at 5; Rec. Doc. 41-1 at 10.

[18] Rec. Doc. 36-1 at 5; Rec. Doc. 41-1 at 10.

[19] Rec. Doc. 36-1 at 6; Rec. Doc. 41-1 at 10.

[20] Rec. Doc. 36-1 at 6; Rec. Doc. 41-1 at 11.

[21] Rec. Doc. 36-1 at 7; Rec. Doc. 41-1 at 12.

3

2019.[22] Plaintiff also admitted to falsifying a Clinical Participation Assessment that purported to be filled out and executed by Dr. Baez.[23] After Dr. Sheth's initial investigation into Plaintiff's misconduct, Dr. Sheth referred the matter to the Course Coordinator, Dr. Ben Mitchell, in UQ's Faculty of Medicine.[24] Dr. Mitchell then referred the matter to Professor Kirsty Foster, the Director of UQ's Office of Medical Education, and the UQ officer responsible for investigating student misconduct in the medical school program.[25]

On October 8, 2019, Professor Foster sent a letter informing Plaintiff of Professor Foster's initial investigation of the matter.[26] On October 10, 2019, Plaintiff met with Professor Foster via Zoom as part of her investigation into Plaintiff's misconduct.[27] During the meeting with Professor Foster, Plaintiff admitted to falsifying attendance records, forging clinical instructors' signatures, and falsifying an evaluation.[28] On October 24, 2019, Professor Foster notified Plaintiff by letter that she was referring the matter to the Academic Registrar for potential violations of UQ's Student Integrity and Misconduct Policy ("SIMP").[29] On October 24, 2019, Professor Foster also sent a letter to Professor Shaw, the Associate Dean (Academic).[30]

On November 7, 2019, Professor Shaw sent a letter to Mark Erickson, UQ's Academic

---

[22] Rec. Doc. 36-1 at 6–7; Rec. Doc. 41-1 at 12.

[23] Rec. Doc. 36-1 at 6–7; Rec. Doc. 41-1 at 12.

[24] Rec. Doc. 36-1 at 7; Rec. Doc. 41-1 at 13.

[25] Rec. Doc. 36-1 at 8; Rec. Doc. 41-1 at 14.

[26] Rec. Doc. 36-1 at 8; Rec. Doc. 41-1 at 14.

[27] Rec. Doc. 36-1 at 8; Rec. Doc. 41-1 at 14–15.

[28] Rec. Doc. 36-1 at 8; Rec. Doc. 41-1 at 15–16.

[29] Rec. Doc. 36-1 at 8–9; Rec. Doc. 41-1 at 16.

[30] Rec. Doc. 36-1 at 9; ; Rec. Doc. 41-1 at 17.

Registrar, referring Plaintiff's misconduct to the Registrar.[31] Professor Shaw sent a revised letter to Mr. Erickson on November 21, 2019.[32] Mr. Erickson referred the matter to Associate Professor Karen Moni, the Acting Chair of the UQ Disciplinary Board, on December 3, 2019.[33]

On December 3, 2019 (New Orleans time)/December 4, 2019 (Brisbane time), UQ Disciplinary Board Acting Secretary Marcelle Kancachian transmitted the Allegation Notice to Plaintiff via email.[34] The Allegation Notice informed Plaintiff that a hearing regarding Plaintiff's alleged misconduct was scheduled for December 11, 2019, on UQ's campus in St. Lucia, Australia.[35] The Allegation Notice further informed Plaintiff that Plaintiff could attend the hearing in person, alone or with a support person, or that Plaintiff could submit an indication of plea along with a written statement regarding the allegations.[36] On December 8, 2019, Plaintiff submitted an Indication of Plea, admitting guilt as to all three of the misconduct allegations: (1) giving to the University a document that the University requires of the student (e.g., medical certificate or other supporting documentation) which is false; (2) making a false representation as to a matter affecting a student as a student; and (3) knowingly providing false or misleading information to staff of the University.[37]

The Disciplinary Board met on December 11, 2019.[38] Plaintiff did not appear at the

---

[31] Rec. Doc. 36-1 at 9; Rec. Doc. 41-1 at 18.

[32] Rec. Doc. 36-1 at 9; Rec. Doc. 41-1 at 18.

[33] Rec. Doc. 36-1 at 10; Rec. Doc. 41-1 at 21.

[34] Rec. Doc. 36-1 at 11; Rec. Doc. 41-1 at 22.

[35] Rec. Doc. 36-1 at 11; Rec. Doc. 41-1 at 22.

[36] Rec. Doc. 36-1 at 11; Rec. Doc. 41-1 at 23.

[37] Rec. Doc. 36-1 at 12; Rec. Doc. 41-1 at 27–28.

[38] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30.

hearing.[39] The Disciplinary Board issued a decision letter to Plaintiff on December 17, 2019.[40] The Disciplinary Board imposed an initial penalty of suspension from the University for two years, effective December 11, 2019; removal of credit for the MED7319 course; and a record of academic misconduct on the University's Misconduct Register.[41]

On January 19, 2020 (New Orleans time), Plaintiff emailed the Academic Registrar to request an appeal.[42] On February 9, 2020, UQ's Student Conduct Department emailed Plaintiff advising Plaintiff that members of the Senate Disciplinary Appeals Committee ("SDAC"), the body that rules on appeals from the Disciplinary Board, would be unable to meet to consider Plaintiff's case until mid-March 2020.[43] On March 9, 2020, the SDAC convened a hearing at UQ's St. Lucia campus.[44] Plaintiff attended the SDAC hearing in person, along with Plaintiff's mother as a support person provided for by University policy.[45] The SDAC's deliberations were carried over to March 10, 2020, when the SDAC made the determination that Plaintiff should be expelled.[46]

On March 12, 2020, UQ's Student Conduct Department emailed Plaintiff a Decision Letter outlining the SDAC's decision regarding Plaintiff's appeal.[47] The SDAC increased the penalty

---

[39] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30.

[40] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30.

[41] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30–31.

[42] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 33–34.

[43] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 34.

[44] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 35.

[45] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 37.

[46] Rec. Doc. 41-1 at 61.

[47] Rec. Doc. 36-1 at 16; Rec. Doc. 41-1 at 42.

from a two-year suspension to expulsion.[48]

## B.  *Procedural Background*

On February 1, 2021, Plaintiff filed a Complaint in this Court against Defendants Ochsner Health System, the University of Queensland, and Ochsner Clinical School.[49] On February 10, 2021, Plaintiff filed a First Supplemental and Amended Complaint, removing "Ochsner Clinical School" as a party and clarifying the name of Ochsner Clinic Foundation, formerly known as Ochsner Health System.[50] Plaintiff alleges that UQ breached the terms of the SIMP in making its decision to expel Plaintiff from the medical school program.[51] Additionally, because Ochsner and UQ were in privity of contract and jointly operated the medical school program, Plaintiff alleges that all of the contractual rights between Plaintiff and UQ and/or Ochsner were the obligations of both UQ and Ochsner.[52] Plaintiff seeks an order vacating UQ's decision, reinstating Plaintiff to medical school, and awarding Plaintiff damages.[53] On April 26, 2021, Defendants filed an Answer and Affirmative and Other Defenses to the First Supplemental and Amended Complaint.[54]

On January 11, 2022, Defendants filed the instant motion for summary judgment.[55] On January 24, 2022, Plaintiff filed an opposition to the instant motion.[56] On February 1, 2022,

---

[48] Rec. Doc. 36-1 at 16; Rec. Doc. 41-1 at 42.

[49] Rec. Doc. 1.

[50] Rec. Doc. 7.

[51] *Id.*

[52] *Id.* at 27.

[53] *Id.* at 28.

[54] Rec. Doc. 16.

[55] Rec. Doc. 36.

[56] Rec. Doc. 41.

Defendants, with leave of Court, filed a reply brief in further support of the motion.[57]

## II. Parties Arguments

### A.    Defendants' Arguments in Support of the Motion

Defendants seek summary judgment on Plaintiff's claims because they argue that the decision to expel Plaintiff was not arbitrary or capricious.[58] Defendants assert that academic institutions are entitled to broad discretion in making decisions regarding academic misconduct.[59] Additionally, Defendants note that private universities are allowed even more discretion than public universities, who are bound by certain constitutional due process protections.[60]

Considering the wide deference given to private universities when making decisions regarding academic misconduct, Defendants assert that Plaintiff cannot prevail on the breach of contract claims by merely demonstrating a technical breach of the SIMP.[61] Rather, Defendants assert that Plaintiff must put forth specific evidence that UQ deviated from procedure to such an extent that the disciplinary proceedings and the ultimate decision was arbitrary and capricious.[62] Defendants contend that Plaintiff has put forth no evidence to show that either: (1) the decision-making process lacked fundamental fairness or (2) UQ's decision to expel Plaintiff from medical school was arbitrary and capricious.[63]

According to Defendants, the SDAC did not deviate from any procedures set forth in the

---

[57] Rec. Doc. 51.

[58] Rec. Doc. 36-2 at 2.

[59] *Id.* at 11.

[60] *Id.* at 12.

[61] *Id.* at 16.

[62] *Id.*

[63] *Id.*

SIMP.[64] Defendants note that Plaintiff was afforded the opportunity to appear before the SDAC and explain the misconduct, for which Plaintiff previously admitted guilt.[65] Defendants note that Plaintiff admitted to engaging in "level 3 – serious" academic misconduct, and the SIMP provides that expulsion is a penalty for such misconduct.[66] According to Defendants, the alleged issues Plaintiff has raised with respect to the SDAC process do not justify overriding its decision.[67]

Because the SDAC, rather than the Disciplinary Board, imposed the expulsion, Defendants contend that the Court need not examine the process or substance of the Disciplinary Board's decision.[68] Nevertheless, because the actions of the Disciplinary Board form the basis of many of Plaintiff's allegations, Defendants argue that the Disciplinary Board provided Plaintiff with a timely hearing as required by the SIMP.[69] Finally, even if the Court were to find that the Disciplinary Board or the SDAC deviated from the SIMP, Defendants argue that summary judgment is still appropriate because Plaintiff cannot put forth evidence that the SDAC's decision was so egregious such that it "did not exercise professional judgment."[70]

**B.      *Plaintiff's Arguments in Opposition to the Motion***

Plaintiff admits the misconduct that occurred in this case.[71] Plaintiff does not dispute that "the wrongs, if analyzed after a fair, proper, and consistent process, could [] justify a suspension

---

[64] *Id.* at 16–17.

[65] *Id.* at 17.

[66] *Id.* at 18.

[67] *Id.* at 19.

[68] *Id.* at 20.

[69] *Id.*

[70] *Id.* (quoting *Regents of the Univ. of Mich. v. Ewing*, 474 U.S. 214, 225–26 (1985)).

[71] Rec. Doc. 41 at 2.

or, potentially, expulsion."[72] Nevertheless, Plaintiff asserts that Defendants "essentially subverted the 'procedural fairness' [they were contractually] obligated to provide to [Plaintiff]."[73]

Plaintiff asserts that Defendants' "legal analysis is couched in broad talismanic terms but never articulates the true legal standard governing this conflict."[74] Although Plaintiff recognizes the wide discretion typically afforded to universities, Plaintiff asserts "universities cannot obligate themselves to a course of conduct and then not adhere thereto."[75] Plaintiff notes that Defendants do not dispute the contractual nature of the SIMP as applied to the relationship between Defendants and Plaintiff.[76] Plaintiff cites *I.F. v. Administrators of the Tulane Educational Fund*[77] for the proposition that a private university is free to craft its Code of Conduct, but once crafted the Code is a contract with the student that the university is compelled to respect.[78] Plaintiff also cites *Kaltenbaugh v. Board of Supervisors*[79] for the proposition that a university's failure to adhere to its own binding procedures is arbitrary and capricious.[80]

Next, Plaintiff argues that Defendants violated several provisions in the SIMP.[81] Plaintiff asserts that UQ violated Section 7.6.2 of the SIMP, a mandatory internal notice provision requiring

---

[72] *Id.*

[73] *Id.*

[74] *Id.* at 4.

[75] *Id.*

[76] *Id.*

[77] 13-0696 (La. App. 4 Cir. 12/23/2013); 131 So. 3d 491.

[78] Rec. Doc. 41 at 6.

[79] 2018-1085 (La. App. 4 Cir. 10/23/19); 282 So. 3d 1133.

[80] Rec. Doc. 41 at 6–7.

[81] *Id.* at 9.

it to refer an allegation of misconduct to a decision maker within five business days.[82] Additionally, Plaintiff asserts that Defendants violated the SIMP's guarantee of "procedural fairness" and a "reasonable opportunity" "to appear before the Decision Maker."[83] Plaintiff contends that Defendants' argument that Plaintiff "chose not to appear at the hearing" is unsupported by the record.[84] Plaintiff contends that there were practical impediments preventing travel from the United States to Australia for the December 11, 2019 hearing, since Plaintiff did not receive notice of the hearing until December 3, 2019 (New Orleans time)/December 4, 2019 (Brisbane time).[85]

Finally, Plaintiff argues that the breaches in the SIMP process were not cured by the SDAC's *de novo* appeal process.[86] Plaintiff contends that there is a question of fact in dispute as to whether "an appeal would have been taken if the prior proceedings conformed to contractual obligations in the first place."[87] Plaintiff states that an appeal would not have been taken if Plaintiff "had a reasonable opportunity to appear before the [Disciplinary Board] to present information and they nonetheless suspended [Plaintiff] as that was a penalty [Plaintiff] recognized as potentially appropriate."[88] Plaintiff states that the appeal was filed due to "the significant procedural defects so as to address medical information concerns."[89] Plaintiff contends that the factual issue as to this decision making process, in light of Defendants' breaches, cannot be resolved on summary

---

[82] *Id.* at 9, 18.

[83] *Id.* at 10–12.

[84] *Id.* at 14–15.

[85] *Id.*

[86] *Id.* at 21.

[87] *Id.*

[88] *Id.* at 22.

[89] *Id.*

judgment.[90] Moreover, Plaintiff asserts that the SDAC process was flawed because it did not receive some of the materials presented to the Disciplinary Board, including briefing notes containing precedent cases indicating that suspension was imposed by the university in similar misconduct cases.[91] Plaintiff also argues that there were flaws in the March 10, 2020 deliberations because information suggests that a member of the SDAC may not have been present and the SDAC discussed "new information from a witness, whose involvement was not made known to [Plaintiff] and to whose information [Plaintiff] could not respond."[92] Plaintiff concludes that "[n]ot only is it likely the SDAC would not have been empaneled if [Defendants] had met their obligation of procedur[al] fairness and provided [Plaintiff] with a reasonable opportunity to appear, but the conduct of the SDAC itself is much at issue."[93]

## C.     Defendants' Arguments in Further Support of the Motion

In the reply brief, Defendants argue that Plaintiff cannot establish that a particular deviation from procedure was so extreme that it rendered the decision to expel Plaintiff "arbitrary and capricious."[94] Defendants assert that the *Kaltenbaugh* case, upon which Plaintiff relied, is inapposite because it involved an employment agreement rather than student discipline.[95] Defendants also assert that the *I.F.* case, upon which Plaintiff extensively relied, is inapposite because it involved general misconduct rather than academic misconduct.[96] Additionally,

---

[90] *Id.*

[91] *Id.* at 22–23.

[92] *Id.* at 24.

[93] *Id.* at 25.

[94] Rec. Doc. 51 at 2.

[95] *Id.* at 3 (citing *Kaltenbaugh*, 282 So. 3d at 1133).

[96] *Id.* (citing *Kaltenbaugh*, 282 So. 3d at 1133).

Defendants argue that Plaintiff misinterprets the holding in *I.F.*[97] Defendants assert that "the *I.F.* court did not hold that failure to comply with university policy rendered a university's actions arbitrary and capricious, it held that the trial court failed to consider that standard" when the trial court denied a motion for a preliminary injunction.[98]

Defendants assert that the decision to expel Plaintiff was not arbitrary, in that Plaintiff has not established that any evidence was disregarded or given improper weight.[99] Likewise, Defendants argue that the decision was not capricious, as Plaintiff admitted guilt.[100] Defendants note that the SIMP provides for expulsion as a penalty for Level 3 misconduct, and Plaintiff admitted to engaging in Level 3 misconduct.[101] Defendants assert that no alleged deviation from the procedures set forth in the SIMP can alter the fact that Plaintiff admitted guilt throughout the process and the decision to expel Plaintiff was based on substantial evidence.[102]

Defendants assert that the timing of the internal referral of Plaintiff's case to the Disciplinary Board is not material because the Allegations Notice was transmitted to Plaintiff nineteen business days after the conclusion of the preliminary investigation.[103] Additionally, Defendants assert that UQ did not violate the provision of the SIMP providing for a reasonable opportunity to appear.[104] Defendants note that Plaintiff submitted a written statement, which

---

[97] *Id.* at 4 (citing *I.F.*, 131 So. 3d at 491).

[98] *Id.* at 4–5 (citing *I.F.*, 131 So. 3d at 491).

[99] *Id.* at 6.

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] *Id.* at 7.

[104] *Id.* at 8.

Defendants suggest satisfied the requirements of the SIMP.[105] Defendants also note that Plaintiff presented no evidence to suggest that Plaintiff could not have made arrangements to appear in Australia within the timeframe allowed.[106] Finally, Defendants assert that Plaintiff has not presented any competent evidence of a violation of any provision of the SIMP by the SDAC.[107] To the extent Plaintiff argued that the SDAC may not have considered the same precedent cases as the Disciplinary Board, Defendants assert that "[t]he Disciplinary Board and the SDAC are not courts of law rigidly bound to follow precedent in prior cases."[108] Finally, Defendants contend that "[t]he specifics of the second day of deliberations are irrelevant to whether the decision made by the SDAC was arbitrary and capricious."[109]

### III. Legal Standard

#### A.    Legal Standard for Summary Judgment

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[110] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[111] All reasonable inferences are drawn in favor of the nonmoving party. Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and

---

[105] *Id.*

[106] *Id.*

[107] *Id.* at 9.

[108] *Id.* at 10.

[109] *Id.*

[110] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[111] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[112]

If the entire record "could not lead a rational trier of fact to find for the non-moving party," then

no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a

matter of law.[113] The nonmoving party may not rest upon the pleadings.[114] Instead, the nonmoving

party must identify specific facts in the record and articulate the precise manner in which that

evidence establishes a genuine issue for trial.[115]

The party seeking summary judgment always bears the initial responsibility of showing the

basis for its motion and identifying record evidence that demonstrates the absence of a genuine

issue of material fact.[116] "To satisfy this burden, the movant may either (1) submit evidentiary

documents that negate the existence of some material element of the opponent's claim or defense,

or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at

trial, demonstrate that the evidence in the record insufficiently supports an essential element of the

opponent's claim or defense."[117] If the moving party satisfies its initial burden, the burden shifts

to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely

how that evidence supports the nonmoving party's claims.[118] The nonmoving party must set forth

---

[112] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[113] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[114] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[115] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[116] *Celotex*, 477 U.S. at 323.

[117] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (quoting *Little*, 939 F.2d at 1299).

[118] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

"specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[119]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[120] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[121] Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.

## B.   *Judicial Review of Academic Misconduct Proceedings*

The Supreme Court has recognized that "[i]t is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."[122] "[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators."[123] "A university is not a court of law, and it is neither practical nor desirable it be one."[124] Ultimately, a court's review of a university's disciplinary decisions "must focus on ensuring the presence of fundamentally fair procedures to determine whether the misconduct has occurred."[125]

---

[119] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[120] *Little*, 37 F.3d at 1075 (internal citations omitted).

[121] *Morris*, 144 F.3d at 380.

[122] *Wood v. Strickland*, 420 U.S. 308, 326 (1975).

[123] *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 648 (1999).

[124] *Plummer v. Univ. of Hous.*, 860 F.3d 767, 773 (5th Cir. 2017) (quoting *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 635 n.1 (6th Cir. 2005)).

[125] *Id.* (internal citations and quotation marks omitted).

Much of the caselaw surrounding judicial review of a school disciplinary matter arises in the context of public education. The right to public education constitutes a property interest protected by the Due Process Clause of the Fourteenth Amendment, and "a State 'may not withdraw that right on grounds of misconduct absent [] fundamentally fair procedures to determine whether the misconduct has occurred.'"[126] These same protections are not available to students enrolled in private colleges and universities.[127] Causes of actions against private colleges and universities are generally limited to breach of contract claims.[128]

Here, the parties do not dispute that the SIMP created contractual obligations between Defendants and Plaintiff. Additionally, the parties do not dispute that Louisiana law applies to Plaintiff's breach of contract claim against both Ochsner and UQ.

Under Louisiana law, "[a] contract between a private institution and a student confers duties upon both parties, which cannot be arbitrarily disregarded and may be judicially enforced."[129] To state a claim for breach of contract, "a plaintiff must point to an identifiable contractual promise that the defendant failed to honor."[130] "Such a claim does not require an inquiry into the nuances of educational processes and theories, but rather, involves an objective assessment of whether the institution made a good faith effort to perform on its promise."[131]

---

[126] *Harris ex rel. Harris v. Pontotoc Cnty. Sch. Dist.*, 635 F.3d 685, 690 (5th Cit. 2011) (alteration in original) (citing *Goss v. Lopez*, 419 U.S. 565, 574 (1975)).

[127] *See Beauchene v. Miss. Coll.*, 986 F. Supp. 2d 755, 768 (S.D. Miss. 2013) (citing *Rendell–Baker v. Kohn*, 457 U.S. 830, 837 (1982); *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988)).

[128] *Guidry v. Our Lady of the Lake Nurse Anesthesia Program Through Our Lady of the Lake Coll.*, 2014-0461 (La. App. 1 Cir. 1/29/15); 170 So. 3d 209, 213 ("It is generally held across the jurisdictions of the United States that the basic legal relation between a student and a private university or college is contractual in nature.").

[129] *Id.* at 213–14 (internal citation omitted).

[130] *Id.* at 214.

[131] *Id.*

Louisiana courts "have declined to apply contract law rigidly in these cases, when doing so would result in overriding a purely academic determination."[132]

Additionally, a "private institution has almost complete autonomy in controlling its internal disciplinary procedures."[133] "[A] private institution is entitled to a very strong but rebuttable presumption that its internal administrative actions are taken in absolute good faith and for the mutual best interest of the school and the student body."[134] "[A] private institution, as compared to a public institution, has the power to create, administer and implement its own rules and procedures concerning the qualifications and conduct of its students, staff and faculty."[135]

Nevertheless, "[t]he fact that the judiciary adheres to this policy of judicial restraint does not render the actions of a private institution inviolate."[136] "The disciplinary decisions of a private school may be reviewed for arbitrary and capricious action."[137] The Louisiana Supreme Court has defined "capricious" as a "conclusion made without substantial evidence or a conclusion contrary to substantial evidence."[138] The word "arbitrary" "implies a disregard of evidence or of the proper weight thereof."[139]

---

[132] *Id.*

[133] *Ahlum v. Adm'rs of Tulane Educ. Fund*, 617 So. 2d 96, 98 (La. App. 4 Cir.), *writ denied sub nom. Ahlum v. Adm'rs of Tulane Educ. Fund*, 624 So. 2d 1230 (La. 1993) (citing *Flint v. St. Augustine High Sch.*, 323 So. 2d 229, 233 (La. App. 4 Cir. 1975), *writ denied*, 325 So. 2d 271 (La. 1976)).

[134] *Id.* (quoting *Flint*, 323 So. 2d at 235, n.1).

[135] *Id.*

[136] *Id.*

[137] *Id.* (citing *Babcock v. Baptist Theological Seminary*, 554 So. 2d 90, 97 (La. App. 4 Cir. 1989); *Lexington Theological Seminary v. Vance*, 596 S.W.2d 11 (Ky. Ct. App. 1979); *Tedeschi v. Wagner Coll.*, 404 N.E.2d 1302 (N.Y. 1980); *Coveney v. President & Trs. of Holy Cross Coll.*, 445 N.E.2d 136 (Mass. 1983)).

[138] *Coliseum Square Assoc. v. New Orleans*, 544 So. 2d 351, 360 (La. 1989).

[139] *Id.*

## IV. Analysis

Defendants seek summary judgment on Plaintiff's claims because they argue that the decision to expel Plaintiff was not arbitrary or capricious.[140] In response, Plaintiff argues that a university's failure to follow its own disciplinary procedures can be considered arbitrary and capricious.[141]

To support this assertion, Plaintiff primarily relies on *I.F. v. Administrators of the Tulane Educational Fund*.[142] In that case, the plaintiff, I.F., a Tulane University student, was charged with simple rape and false imprisonment of another university student, but he was later acquitted on all charges.[143] After the acquittal, I.F. participated in a three-day disciplinary proceeding before the Tulane Joint Hearing Board for allegedly committing "Sexual Misconduct" in violation of the Code of Student Conduct.[144] The Board found I.F. responsible for sexual misconduct as charged because it found that "clear and convincing" evidence existed that the victim was intoxicated and that I.F. knew, or should have known, this fact.[145] After Tulane's Appellate Board dismissed I.F.'s appeal of the hearing board's decision, I.F. filed a petition for preliminary injunction and permanent injunction in Louisiana state court.[146] The trial court dismissed the petition, and I.F. appealed.[147] On appeal, the Louisiana Fourth Circuit Court of Appeal reversed, holding that "the

---

[140] Rec. Doc. 36-2 at 2.

[141] Rec. Doc. 41 at 6.

[142] 13-0696 (La. App. 4 Cir. 12/23/2013); 131 So. 3d 491.

[143] *Id.* at 493.

[144] *Id.* at 494.

[145] *Id.*

[146] *Id.*

[147] *Id.*

trial court erred in granting the motion to dismiss before holding an evidentiary hearing as required by law."[148]

On remand, the trial court held an evidentiary hearing but limited the evidence to the issue of due process.[149] Following the evidentiary hearing, the trial court issued judgment in favor of Tulane finding that I.F. received due process in connection with the Tulane proceedings *and* that Tulane's decision was not arbitrary or capricious.[150] I.F. appealed for a second time, and the Louisiana Fourth Circuit Court of Appeal held that the trial court erred by issuing reasons for judgment on the issues of arbitrariness and capriciousness because no such evidence was presented at the evidentiary hearing.[151]

The appellate court also found that the trial court erred by failing to examine the appellate process afforded by Tulane.[152] The appellate court found that Tulane and I.F. were in a contractual relationship during I.F.'s attendance at the university, and Tulane "imposed upon itself the duty by its own policies and procedures and it is obligated contractually to follow through completely, meaningfully, and in good faith."[153] The appellate court noted that I.F. was not provided with a copy of the Conduct Manual, which included a three-page single-spaced explanation of sexual misconduct cases and the questions the joint hearing boards must answer in deciding whether to sustain a charge.[154] The Louisiana Fourth Circuit found that "I.F. was entitled to know the

---

[148] *Id.* at 494–95.

[149] *Id.* at 495.

[150] *Id.*

[151] *Id.* at 497.

[152] *Id.*

[153] *Id.* at 497–98.

[154] *Id.*

standards by which his evidence would be received, his burden of proof, and what the hearing

panel would be considering when determining whether he was guilty of sexual misconduct."[155]

Based on the evidence presented, the court found that "I.F.'s procedural due process rights were

ill-defined, ambiguously applied, and, as such, presumptively violated."[156] Therefore, the court

reversed the trial court's decision and remanded the matter in order to afford the parties an

opportunity to put on all relevant evidence as to the due process afforded to I.F. and the

arbitrariness and capriciousness of Tulane's decision.[157]

Considering this precedent, a university's failure to adhere to its own binding procedures

can make a resulting decision arbitrary and capricious.[158] Nevertheless, to state a claim for breach

of contract, "a plaintiff must point to an identifiable contractual promise that the defendant failed

to honor."[159] "Such a claim does not require an inquiry into the nuances of educational processes

and theories, but rather, involves an objective assessment of whether the institution made a good

faith effort to perform on its promise."[160] Louisiana courts "have declined to apply contract law

rigidly in these cases, when doing so would result in overriding a purely academic

determination."[161]

Here, Plaintiff admitted to engaging in academic misconduct. Academic misconduct

---

[155] *Id.* at 499–500.

[156] *Id.* at 500.

[157] *Id.*

[158] *See also Kaltenbaugh v. Bd. of Supervisors*, 2018-1085 (La. App. 4 Cir. 10/23/19); 282 So. 3d 1133 ("Because SUNO did not follow its own binding procedures, its decision was arbitrary and capricious, and not entitled to deference.").

[159] *Guidry*, 170 So. 3d at 214.

[160] *Id.*

[161] *Id.*

investigations and proceedings at UQ are governed by the Student Integrity and Misconduct Policy ("SIMP").[162] The SIMP defines the rights of students under the policy as follows: "In accordance with the requirements of procedural fairness, students have the right to – (a) have a case of alleged misconduct dealt with as promptly as possible; (b) receive a copy of, or an opportunity to inspect, all relevant evidence held by the decision-maker; (c) be given an opportunity to appear before the decision-maker to answer the allegation; (d) appeal a decision to a designated person or body who is not the decision-maker."[163] The SIMP defines academic misconduct to include "making a false representation as to a matter affecting a student as a student" and "giving to the University a document that the University requires of the student (e[.g.,] medical certificate or other supporting documentation) which is false."[164] The SIMP defines "level 3" misconduct as misconduct that is "serious."[165] The SIMP additionally provides that in cases of level 3 academic misconduct "a decision-maker may impose . . . expulsion from the University."[166]

On December 8, 2019, Plaintiff submitted an Indication of Plea, admitting guilt as to all three of the misconduct allegations: (1) giving to the University a document that the University requires of the student (e.g., medical certificate or other supporting documentation) which is false; (2) making a false representation as to a matter affecting a student as a student; and (3) knowingly providing false or misleading information to staff of the University.[167] The Disciplinary Board met

---

[162] Rec. Doc. 36-5 at 87–108.

[163] *Id.* at 91.

[164] *Id.* at 92.

[165] *Id.* at 94.

[166] *Id.* at 100–01.

[167] Rec. Doc. 36-1 at 12; Rec. Doc. 41-1 at 27–28.

on December 11, 2019.[168] Plaintiff did not appear at the hearing.[169] The Disciplinary Board issued a decision letter to Plaintiff on December 17, 2019.[170] The Disciplinary Board imposed an initial penalty of suspension from the University for two years, effective December 11, 2019; removal of credit for the MED7319 course; and a record of academic misconduct on the University's Misconduct Register.[171]

On January 19, 2020 (New Orleans time), Plaintiff emailed the Academic Registrar to request an appeal.[172] On March 9, 2020, the SDAC convened a hearing at UQ's St. Lucia campus.[173] Plaintiff attended the SDAC hearing in person, along with Plaintiff's mother as a support person provided for by University policy.[174] The SDAC's deliberations were carried over to March 10, 2020, when the SDAC made the determination that Plaintiff should be expelled.[175] On March 12, 2020, UQ's Student Conduct Department emailed Plaintiff a Decision Letter outlining the SDAC's decision regarding Plaintiff's appeal.[176] The SDAC increased the penalty from a two-year suspension to expulsion.[177]

Plaintiff argues that Defendants breached their obligations under the SIMP by: (1) failing to follow certain internal referral requirements; and (2) failing to give Plaintiff a reasonable

---

[168] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30.

[169] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30.

[170] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30.

[171] Rec. Doc. 36-1 at 13; Rec. Doc. 41-1 at 30–31.

[172] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 33–34.

[173] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 35.

[174] Rec. Doc. 36-1 at 14; Rec. Doc. 41-1 at 37.

[175] Rec. Doc. 41-1 at 61.

[176] Rec. Doc. 36-1 at 16; Rec. Doc. 41-1 at 42.

[177] Rec. Doc. 36-1 at 16; Rec. Doc. 41-1 at 42.

opportunity to appear at the Disciplinary Board hearing.[178] Plaintiff also argues that alleged errors in the SDAC's appellate review rendered the decision to expel Plaintiff arbitrary and capricious.[179] Each of these issues is addressed in turn.

## A.   *Failure to Follow Internal Referral Requirements*

Plaintiff contends that a five-business-day mandatory referral requirement was violated in this case.[180] The SIMP provides that complaints of academic misconduct are first referred "to a relevant integrity officer," after which a member of staff must "conduct a preliminary investigation in a timely manner" "in consultation with the integrity officer."[181] After conclusion of a preliminary investigation, an Integrity Officer may decide to counsel a student for inadvertent, unintentional, and minor academic misconduct.[182] "If the Integrity Officer or Academic Registrar does not decide to counsel a student . . . the Integrity Officer or Academic Registrar must refer the allegation to relevant decision-maker, giving consideration to the nature of the allegation and the disciplinary record of the student."[183] Section 7.6.2 of the SIMP provides, "[t]he Integrity Officer or Academic Registrar must refer an allegation of misconduct to a relevant decision-maker within 5 business days of the completion of the preliminary investigation."[184] Section 8.3.1 further provides, "[i]f an allegation is referred to a decision-maker following a preliminary investigation under section 7.3, the decision-maker must issue an allegation notice to the student within 14

---

[178] Rec. Doc. 41 at 9–21.

[179] *Id.* at 21–25.

[180] *Id.* at 9–10.

[181] Rec. Doc. 36-5 at 95.

[182] *Id.*

[183] *Id.* at 96.

[184] *Id.*

business days."[185]

Plaintiff argues that Defendants violated Section 7.6.2 of the SIMP. On November 7, 2019, Professor Shaw sent a letter to Mark Erickson, UQ's Academic Registrar, referring Plaintiff's misconduct to the Registrar.[186] Plaintiff asserts that this letter marked the end of the "preliminary investigation" and triggered the five-business-day referral requirement found in Section 7.6.2. Defendants do not dispute that Mr. Erickson was not an authorized decisionmaker under the SIMP, and therefore the referral from Professor Shaw to Mr. Erickson did not satisfy the requirements of Section 7.6.2.[187] On December 3, 2019, Mr. Erickson referred the matter to Associate Professor Karen Moni, the Acting Chair of the UQ Disciplinary Board, who was an authorized decisionmaker under the SIMP.[188]

Even assuming that Defendants technically violated Section 7.6.2, Plaintiff has not demonstrated that such a violation would render the ultimate decision to expel Plaintiff arbitrary or capricious. As Defendants point out, the five-business-day referral requirement is an internal deadline, and the SIMP does not require that the student receive a copy of the referral to the decisionmaker. Pursuant to Section 8.3.1, the decisionmaker must issue an allegation notice to the student within 14 business days of the referral. Reading Sections 7.6.2 and 8.3.1 together, the university must issue the allegation notice to the student within 19 business days of the completion of the preliminary investigation. The allegation notice was issued to Plaintiff on December 4, 2019 (Brisbane time), which was within nineteen business days of November 7, 2019. Therefore,

---

[185] *Id.* at 97.

[186] Rec. Doc. 36-1 at 9; Rec. Doc. 41-1 at 18.

[187] Defendants dispute whether the preliminary investigation was in fact complete on November 7, 2019. Rec. Doc. 51 at 7. The Court need not resolve this factual dispute.

[188] Rec. Doc. 36-1 at 10; Rec. Doc. 41-1 at 21.

Plaintiff received notice within the period contemplated by the SIMP.  Accordingly, there are no material facts in dispute and the allegation notice was issued to Plaintiff in substantial compliance with the university's procedures.[189]

**B.      *Failure to Give Plaintiff a Reasonable Opportunity to Appear at the Disciplinary Board Hearing***

Plaintiff asserts that Defendants violated the SIMP's guarantee of "procedural fairness" and a "reasonable opportunity" "to appear before the Decision Maker."[190] Plaintiff contends that Defendants' argument that Plaintiff "chose not to appear at the hearing" is unsupported by the record.[191] Plaintiff contends that there were practical impediments preventing travel from the United States to Australia for the December 11, 2019 hearing, since Plaintiff did not receive notice of the hearing until December 3, 2019 (New Orleans time)/December 4, 2019 (Brisbane time).[192]

Section 4.2(a) of the SIMP provides that "[d]isciplinary procedures must be fair and just, and consistent with the requirements of procedural fairness.[193] Section 5(a) provides that a student has "the right to . . . be given an opportunity to appear before the decision-maker to answer the allegation."[194] Pursuant to Section 8.5.3(b), the decisionmaker must "give the student a reasonable opportunity to appear before the decision-maker to answer the allegations, and in particular, to comment on the substantive material on which the allegation is based."[195]

---

[189] *See Beauchene*, 986 F. Supp. 2d at 771.

[190] Rec. Doc. 41 at 10–12.

[191] *Id.* at 14–15.

[192] *Id.*

[193] Rec. Doc. 36-5 at 91.

[194] *Id.*

[195] *Id.* at 98.

The SIMP does not obligate UQ to ensure Plaintiff's in-person attendance at the hearing. Plaintiff argues that Defendants denied Plaintiff a "reasonable opportunity" to appear because the Allegations Notice was sent to Plaintiff less than five business days prior to the hearing. Plaintiff cites the deposition testimony of UQ's 30(b)(6) representative, Mark Erikson, who testified that five business days would be "reasonable" notice.[196] However, the SIMP does not obligate UQ to send the Allegation Notice to Plaintiff at least five business days prior to the commencement of the Disciplinary Board hearing. Therefore, Defendants did not violate any specific provision of the SIMP when they sent notice of the December 11, 2019 hearing to Plaintiff on December 4, 2019 (Brisbane time).

Plaintiff was also given a reasonable opportunity to be heard, both in person and in writing. Plaintiff was able to submit a written statement and evidence to comment on the substance of the allegations. Specifically, on December 8, 2019, Plaintiff submitted an Indication of Plea, admitting guilt as to all three of the misconduct allegations: (1) giving to the University a document that the University requires of the student (e.g., medical certificate or other supporting documentation) which is false; (2) making a false representation as to a matter affecting a student as a student; and (3) knowingly providing false or misleading information to staff of the University.[197] Plaintiff's deposition testimony establishes that Plaintiff had the opportunity to write whatever Plaintiff wanted on the statement submitted to the Disciplinary Board and that Plaintiff could submit any evidence to be considered by the Disciplinary Board.[198] Therefore, Plaintiff was not denied a reasonable opportunity to answer the allegations and to comment on the material supporting those

---

[196] Rec. Doc. 41-3 at 10.

[197] Rec. Doc. 36-1 at 12; Rec. Doc. 41-1 at 27–28.

[198] Rec. Doc. 36-4 at 60–61.

allegations.

Additionally, Plaintiff also has not shown that Plaintiff was not afforded a reasonable opportunity to attend the Disciplinary Board hearing in person. Plaintiff notes the logistical challenges of traveling from the United States to Australia on such short notice. In a declaration, Plaintiff states, "I did not receive sufficient advance notice to make necessary preparations including but not limited to travel arrangements, locating a support person to accompany me, reviewing all documents presented in the agenda, seeking counsel and preparing my testimony."[199] However, Plaintiff has presented no evidence to show that Plaintiff was *unable* to make arrangements to appear in Australia at the hearing within the time frame allowed. Although traveling to Australia on such a short time frame would have been difficult, Plaintiff has not shown that it was impossible. Additionally, Plaintiff did not request a continuance of the hearing to allow more time to arrange travel, nor did Plaintiff request an accommodation, such as appearing via Zoom. Considering the undisputed evidence in the record, Plaintiff was provided a reasonable opportunity to appear at the December 11, 2019 hearing, but Plaintiff chose to submit a written Indication of Plea, statement, and supporting documentation rather than travel to Australia to appear in person.

Alternatively, a reasonable fact finder could not conclude that Defendants' failure to give Plaintiff more notice of the hearing date rendered the disciplinary decision arbitrary or capricious. Plaintiff admitted guilt at each stage of the disciplinary proceeding. The Disciplinary Board's decision was based on substantial evidence and was not contrary to the evidence.[200] Additionally,

---

[199] Rec. Doc. 41-11 at 1.

[200] *Coliseum Square Assoc.*, 544 So. 2d at 360.

the Disciplinary Board did not disregard evidence or improperly weigh the evidence presented.[201] Accordingly, there are no material facts in dispute as to this issue, and the Court concludes that Defendants gave Plaintiff sufficient notice of the Disciplinary Board Hearing in substantial compliance with the university's procedures.[202]

## C.   Alleged Errors in the SDAC's Appellate Review

Plaintiff also argues that alleged errors in the SDAC's appellate review rendered the decision to expel Plaintiff arbitrary and capricious.[203] Plaintiff argues that the breaches in the SIMP process were not cured by the SDAC's *de novo* appeal process.[204] Plaintiff contends that there is a question of fact in dispute as to whether "an appeal would have been taken if the prior proceedings conformed to contractual obligations in the first place."[205] This argument is unavailing because, for the reasons discussed above, the Disciplinary Board hearing substantially complied with the university's procedures.

Moreover, Plaintiff asserts that the SDAC process was flawed because it did not receive some of the materials presented to the Disciplinary Board, including briefing notes containing precedent cases indicating that suspension was imposed by the university in similar misconduct cases.[206] However, Plaintiff does not explain how the failure to consider precedent cases could violate the SIMP. Plaintiff admitted committing level 3 academic misconduct, and the SIMP provides that in cases of level 3 academic misconduct "a decision-maker may impose . . . expulsion

---

[201] *Id.*

[202] *See Beauchene*, 986 F. Supp. 2d at 771.

[203] Rec. Doc. 41 at 21–25.

[204] *Id.* at 21.

[205] *Id.*

[206] *Id.* at 22–23.

from the University."[207]

Plaintiff also argues that there were flaws in the March 10, 2020 deliberations because information suggests that a member of the SDAC may not have been present.[208] However, this argument is completely unsubstantiated. The SDAC was comprised of four individuals, two of whom were students, Lachlan Green and Ethan Van Roo Douglas.[209] Plaintiff asserts that there is no affirmative evidence establishing that the students attended the March 10, 2019 meeting.[210] However, it is undisputed that all four members of the SDAC ultimately agreed with the SDAC's decision to expel Plaintiff.[211]

Finally, Plaintiff argues that the SDAC discussed "new information from a witness, whose involvement was not made known to [Plaintiff] and to whose information [Plaintiff] could not respond."[212] Specifically, the SDAC file contains a "file note" from an interview with Maree Nelson of the medical faculty.[213] Ms. Nelson did not testify at the SDAC hearing.[214] The note states:

---

[207] Rec. Doc. 36-5 at 100–01. Plaintiff also argues that the SDAC did not receive the November 7, 2019 report of preliminary investigation, the November 23, 2019 email advising that Student Conduct was pushing through as many Disciplinary Board proceedings before the end of the year as possible, or the November 29, 2019 correspondence reporting contact from legal counsel. Rec. Doc. 41 at 23. These documents are internal communications between UQ staff, not evidence considered by the Disciplinary Board.

[208] Rec. Doc. 36-5 at 24.

[209] Rec. Doc. 41-1 at 59.

[210] *Id.* at 60.

[211] Rec. Doc. 36-1 at 16; Rec. Doc. 41-1 at 42.

[212] Rec. Doc. 40 at 24.

[213] Rec. Doc. 41-7 at 128.

[214] *Id.* at 14–15.

File Note – Conversation with Maree Nelson, Medicine Faculty

Practice in USA

- Very competitive
- Matching process
- Match with hospital to do residency
- Match is critical or else likely to fail
- Longer program than prescribed – will be looked upon as a negative in the US
- If the student does not get to practice as a medical practitioner – they may get a job in another country with the qualifications that they gain ie. Australia

If suspended – ADA would be likely to allow the student to come back after undertaking remedial activities

Academic Registrar can report the student to AHPRA

US Medie ECFMG – Education Commission for Foreign Medical Graduates

- Student applies themselves
- Verification process
- National Board Examiners

Teaching Plan is offered usually for no more than 12 months interruption

The note appears to provide background information on how a suspension from medical school would impact a medical professional in the United States. Plaintiff does not provide a specific argument as to how consideration of this information violated the SIMP. Moreover, Plaintiff has not shown that consideration of this information rendered the SDAC's decision arbitrary and capricious. The SDAC's decision was based on substantial evidence and was not contrary to the evidence.[215] Additionally, the SDAC did not disregard evidence or improperly weigh the evidence presented.[216] Accordingly, there are no genuine issues of material fact in dispute and Defendants are entitled to judgment as a matter of law.

---

[215] *Coliseum Square Assoc.*, 544 So. 2d at 360.

[216] *Id.*

31

### V. Conclusion

Under Louisiana law, "[a] contract between a private institution and a student confers duties upon both parties, which cannot be arbitrarily disregarded and may be judicially enforced."[217] Louisiana courts "have declined to apply contract law rigidly in these cases, when doing so would result in overriding a purely academic determination."[218] "[A] private institution, as compared to a public institution, has the power to create, administer and implement its own rules and procedures concerning the qualifications and conduct of its students, staff and faculty."[219] Nevertheless, "[t]he fact that the judiciary adheres to this policy of judicial restraint does not render the actions of a private institution inviolate."[220] "The disciplinary decisions of a private school may be reviewed for arbitrary and capricious action."[221]

Here, Plaintiff was expelled from a medical school program jointly administered by Ochsner Clinic Foundation and University of Queensland after Plaintiff admitted to falsifying attendance documents, forging the signatures of two of the physicians overseeing Plaintiff's clinical rotations, and forging a clinical assessment of Plaintiff's performance during the rotation.[222] Plaintiff filed this suit seeking to vacate Defendants' decision to expel Plaintiff because Plaintiff alleges that Defendants breached their contractual obligations to Plaintiff.[223] For the

---

[217] *Guidry*, 170 So. 3d at 213–14 (internal citation omitted).

[218] *Id.* at 214.

[219] *Ahlum*, 617 So. 2d at 98.

[220] *Id.*

[221] *Id.* (citing *Babcock*, 554 So. 2d at 97; *Lexington Theological Seminary*, 596 S.W.2d 11; *Tedeschi*, 404 N.E.2d 1302; *Coveney*, 445 N.E.2d 136).

[222] *See* Rec. Doc. 36-1; Rec. Doc. 41-1.

[223] Rec. Doc. 7.

reasons set forth above, the undisputed evidence establishes that Defendants' decision to expel Plaintiff was not arbitrary or capricious. The SDAC's decision was based on substantial evidence and was not contrary to the evidence.[224] Additionally, the SDAC did not disregard evidence or improperly weigh the evidence presented.[225] Therefore, because there are no material facts in dispute, the Court grants summary judgment in favor of Defendants. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment[226] is **GRANTED**.

**NEW ORLEANS, LOUISIANA**, this __4th__ day of March, 2022.

**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[224] *Coliseum Square Assoc.*, 544 So. 2d at 360.

[225] *Id.*

[226] Rec. Doc. 36.